Good morning, Your Honors. May it please the Court. My name is Alan Hutchison. I'm here representing Zezluma Perdomo and later her sister. These cases have much in common, but the government wants to argue them separately, so I will do so. We have two major issues in the case. Basically, the question of the definition of what is a particular social group and whether all the women living in Guatemala comprise such a social group. And the second issue is whether, if they are a particular social group, whether they are suffering harassment, discrimination, and persecution. Now, in this particular case, I would like to put most of my emphasis on the persecution because while Zezluma raised the issue that she was a member of a particular social group before the immigration judge, the Board ignored that issue completely and dismissed her case on the ground that the only issue she raised was the general civil unrest in Costa Rica and that that is not sufficient ground. So they basically said even if women constitute a social group, they haven't shown you didn't show a nexus. Excuse me, Your Honor? Even if, as I understand the Board's ruling, even if women were to constitute a social group, one of the protected grounds. Yes. That the evidence that you presented was insufficient to show that whatever harm she might suffer would be unaccountable. We did introduce evidence before the immigration judge, Your Honor, quite a bit of evidence that was available at that time in 2005. But we're looking at the records. We have to focus on what's in the records. All right. Well, with the immigration judge, he faced this issue. And I indicated that 520 women had suffered femicide that particular year in Guatemala. He checked and said, well, there are approximately 14 million people living in Guatemala. Half of them are women. Divided 7 million into 500. Said that is such a small figure, it's infinitesimal. I'm sorry. To the degree that you're relying on an argument that the BIA didn't address something that the IJ did address, I think that argument is in trouble because the BIA cites Maduro Bourbono. Maduro Bourbono says we adopt the decision of the IJ. Well, if he accepted the decision of the IJ, they also accepted his decision that she is not a member of a particular social group. Right. But to the degree that you're saying that there's insufficient discussion because Maduro Bourbono is cited, you've got to argue that there was insufficient discussion in either the BIA or the IJ opinion. Yeah. Well, we did discuss it at the immigration court level. And the question we have to consider is does she have a well-founded future fear of persecution? And we have overwhelming facts, and they keep developing since she's been in court in 2005, that every year the number of women killed in Guatemala is increasing at a substantial rate. So from the time Zelena was in court to last year, we've had a 45 percent increase in femicides. Now, femicide is not- Counsel, may I just ask here, you gave plenty of evidence of general lawlessness, but I'd like to go back to the question of the IJ. You have to show that she's being murdered or women are being murdered because they are women. Where have you done that? Absolutely, Your Honor. The situation in Guatemala has become so bad, it has the highest rate of femicide in the Western Hemisphere, one of the highest in the world. There was tremendous international pressure brought on them, and last year the government of Guatemala enacted a decree declaring femicide a specific crime. And then last year we had the- no, it was earlier this year, the first case involving femicide was brought before the Inter-American Commission on Human Rights, and they condemned the government of Guatemala for failing to take these cases seriously because in the last five years there have been less than 2 percent of the cases that have been solved. Actually, 0.02 percent. And generally, even a 10 percent chance is enough, but this isn't even close. Well, this is a situation the government of Guatemala is unwilling to do anything about, and femicide is by definition a crime specifically against women because of their gender. And it's mentioned specifically in the latest U.S. State Department report that says, you know, women are subject to rape, torture, mutilation, and death, and this is increasing. So even our U.S. State Department has recognized this problem, Your Honor. All right, but what is the evidence about men being murdered? Oh, it's a very high rate. Guatemala has a very, very high murder rate. But the really question is, I mean, there's terrible lawlessness, but are women being murdered because they are women? Yes, they are. Or are a lot of people being murdered? Well, to answer your question, Your Honor, yes, a lot of people are being murdered in Guatemala. It has one of the highest homicide rates in the world. But the femicides are distinct. These women are sexually molested in almost every case, physically mutilated, and then killed, and the evidence indicates the bodies are not even hidden. They're left out in the open as a statement. That's a femicide. All right, thank you. There were 720 last year. Assuming that we go so far with you as to conclude that there is evidence in this record that significant numbers of women in Guatemala are being murdered because they are women, and I'm willing to assume that even if the numbers of men or percentage of men murdered is higher, that doesn't necessarily mean that the women murdered are not because they're being murdered because they're women. So I'm willing to go with you so far as that. How do we know that your client is sufficiently likely to be murdered because she is a woman that she should be given asylum? Well, if the women of Guatemala are a particular social group and there is evidence that they are being persecuted, this high level of femicides, then they're not required to prove specifically that they are going to be targeted, but merely that they are members of the group, and that is the argument. But once someone is a member of a group, and here I'll take a less problematic group, that person then has to show that even as a member of that group, that there is a sufficiently high percentage of risk of harm. Now, one of our cases says, and this is the case that Judge Nelson had in mind, says a 10% risk of harm is enough if the harm is serious enough, but how do you establish on this record that there is a substantial risk that your client will be murdered because she is a woman? I'm giving you the social group. Now I'm asking what's the risk to your client? Well, Your Honor, I don't think we have to prove that every year 10% of 7 million women in Guatemala have been murdered to meet the threshold of a 10% chance of persecution. If my client has a subjective fear, which the judge found she had, he found she did not have an objective fear. But if we have these distinctive femicides of women, and it's practically the highest rate in the world, the only other country that has a higher rate of particular deaths of women is South Africa, and they are not really femicides. They are mostly domestic relations disputes. This is a very unique situation in the world today, and I think they have very good reason to fear going back to Guatemala, particularly after 21 years of living in the United States and coming here as a teenager and now in their 30s. Okay. Why don't we hear from the government? Then you get a chance to respond. And I'll reserve the rest. And obviously you've got two cases with virtually identical facts, not quite. So I think we'll hear from you again on these points. Good morning, Your Honors, and may it please the Court. My name is Catherine Clark, appearing on behalf of the U.S. Attorney General. The question of whether women are a particular social group is not at issue in this case. This is purely an evidentiary case as to whether Petitioner has shown any individualized risk of motive, of persecution on account. When you say it's not at issue in this case, why do you say that? Because the agency reached no holding on whether women constitute a particular social group under the Immigration and Nationality Act, and it was not required to because Petitioner presented no individualized evidence of risk. I see. You're saying that the question is pretermitted. The question was simply not addressed. And because it was not addressed, the ---- Are we then supposed to assume for purposes of the argument today that women are a social group and simply move to the question of whether this particular individual is at sufficient risk? The Court should not decide whether women are a social group. But we should assume that they are for purposes of this case. As the Board did. The Board had to assume. Even if the Court did assume, and even if the agency decisions are read to make that assumption, the petition for review here should be denied because there is no evidence of an individual risk here or any tie between the killings and the asserted particular social group. Petitioner could have proven here that ---- Petitioner could have introduced evidence to, in an attempt to prove, that women here were killed on account of their gender, that there was, in fact, a 10 percent chance. She did not meet that burden. The statistics simply do not rise to that level. Additionally, Petitioner could have introduced evidence that women are subject to more violence than men. She did not do so. She also did not introduce evidence to show that she is part of a group of women that might be particularly vulnerable. She did not assert that she was in any sort of domestic relationship where she might be vulnerable to violence. She did not assert that she had any connections to gangs or any connections to narco-traffickers or gang resistors or any other groups of women who might face special vulnerability in Guatemala. Excuse me for interrupting, but this woman has lived here most of her life. I mean, those kinds of production of evidence, I mean, it seems a particularly difficult case when if the mother had applied, both the sisters would be eligible to stay here. Does he, does your service ever consider mediation in this kind of case? This is, this is simply not an appropriate case for mediation because the, because this is an asylum application. The only application she has presented here is her own asylum application, and that was, and that was not, that was not granted because she presented insufficient evidence to either connect the crime in Guatemala to gender or to connect herself as an individual to a group that might be vulnerable to risk. And there are no other applications at issue to mediate in this case. And it would have been, essentially, there's no individualized evidence here. There's a very high crime rate in Guatemala, but the, most of those, most of those offenses have men as their victims. And the vast majority, and some, even using petitioner's own statistics, that majority rises to perhaps 86 percent of the victims are men. Let me pursue the line of questioning initiated, or the suggestion initiated by Judge Nelson, but with a slightly different tack. Judge Nelson asked about mediation. You said this is not suitable for mediation because it's asylum. I'm not sure that that is necessarily true. I'm not sure that the Attorney General has a categorical rule that there's never mediation in asylum cases. Passing that, however, you probably, in fact, I'm sure, noticed that the I.J. here specifically said, this case cries out for humanitarian relief from DHS. Do you recall reading that? That is the deferred and forced departure language. Do you recall reading that? Yes, that was in the immigration judge's decision. Now, I've never met, but I know fairly well this I.J. from reviewing his orders over the years. This particular I.J. is, to state it mildly, a hard-nosed, rather unsympathetic. I don't know why I want to say that. If empathy is a bad thing, this is a very good judge. Yet even this judge says this case cries out for humanitarian relief from DHS. Do you agree? My opinion on the case, of course, is not pertinent. And additionally, the immigration judge and the Department of Justice, the Attorney General, have no power to grant deferred and forced departure. That is entirely up to them. Does the Department of Justice have within its power to recommend to DHS that a humanitarian relief be granted? I do not believe so. You mean can't even write a letter? I do not believe that would be appropriate. Who within DHS has the authority to make that call? As to this particular petitioner, I am not entirely certain of the answer. Is it the local office or is it somebody back in D.C.? I would not want to answer that question with absolute certainty right now. I can advise the Court of that in a letter. But it is simply ñ there's simply nothing that the Department of Justice can do to require that in any event. There's no ñ that is entirely up to Immigration and Customs Enforcement within DHS. And as to mediation, the Court may issue a decision on the validity of the agency's removal order and denial of relief here, even if petitioner were to receive deferred and forced departure. This is an important point to emphasize with regard to that particular form of sort of humanitarian remedy. Deferred and forced departure is a stay of removal. It does not affect the validity of the removal order. And the removal order continues in effect after ñ even if deferred and forced departure is granted. And so ñ But the net consequence is the person gets to stay in this country. For the length of the stay of removal. Correct. However, the stay of removal is entirely within the discretion of ICE and it is not bound up with the validity of the agency decisions here. The Court can reach a decision on the validity of these agency decisions entirely absent any issues of deferred and forced departure. I understand that. And I will come back to my question because I'm not sure you answered it with full knowledge of the underlying abilities or responsibilities of your department. Maybe you answered the question as you did because you're uncertain of the answer. You don't want to give anything away that you don't have to give away. But actually, I have to say it would surprise me if it is not within the power of the Attorney General or of someone else within your department to write a letter making some recommendation with respect to humanitarian relief. And I will ñ I will continue to ñ I will continue to maintain the position that I stated earlier. And if the Court has no further questions, I will sum up. Let me just ñ let me have one last question for you. Of course. Did your counsel petition for humanitarian relief after this proceeding? The ñ not to my knowledge. So how does it ñ how does one ñ how does one in Petitioner's situation bring this kind of relief to the attention of DHS, you know, to ICE's attention? Petitioner could write ñ Petitioner could write to DHS to request that sort of remedy. I am not certain as to whether that has occurred. That would be a Petitioner's obligation to advise. What if her lawyer wrote ICE a letter and said, you know, at this discussion at the Ninth Circuit Court of Appeals, the judges, you know, suggested that this might be an appropriate, you know, something the agency might want to look at. Could he do that? I'm ñ I'm not aware of any regulations that would prevent him from doing that. And ñ In the meantime, the agency could remove her. In the meantime, absent any grant of deferred enforced departure, yes, the agency could remove him ñ could remove her. And the ñ but regardless of any of that, the question before the Court is the validity of the agency decisions here.  And any question of deferred enforced departure would be separate and would simply ñ it would simply not prevent a decision in this case because the removal order would still exist. All right. Got it. Because substantial evidence in the record supports the agency's finding of no protected motive, because the agency made no ruling as to whether Petitioner articulated a viable particular social group, the Court should deny the petition for review. Thank you. Would you like to respond at this time, or do you want to make your response part of your presentation in the next case? Your ñ your choice. Let me say, as a lawyer, I would love to win a stunning legal victory that all the women in Guatemala are members of particular groups subject to persecution. But if this Court has a recommendation for humanitarian relief, my first responsibility is to my clients, and I would certainly encourage the Court to do so, because considering their situation of all the years they've been in the United States and handling many Guatemalan clients, these two sisters have a brother who is back in Guatemala and having a very, very difficult time. And the people who go back there, if they've been in the United States ñ Why don't you just write to ICE and ask for humanitarian relief? I'm sorry, Your Honor? Why don't you just initiate the process? Well, I will. To their attention. I would like to complete the legal argument, though, and I would certainly follow this through with their request for humanitarian relief for both of them. Specifically, if there was a recommendation from the Ninth Circuit, I think that would carry great weight. Okay. Why don't ñ this is somewhat of a formalistic proposition. Why don't you sit down and then get up again, and then we're on the next case? All right. And if you like, you can pretend that you sat down and pretend that you got up again. Okay. Very good, Your Honor. This is the case of Leslie Perdomo. For formality's sake, I will say the case of Zelima v. Perdomo has now been submitted for decision.
judges: D.W. Nelson, W. Fletcher, Paez